FILED
12/07/2021
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2021

# IN RE K.W.[1]

**Appeal from the Juvenile Court for Williamson County**
**No. 31917-94JC1-2017      Sharon Guffee, Judge**

_____

## No. M2021-00408-COA-R3-PT

_____

This is an appeal from a termination of parental rights case. The trial court determined that three grounds for termination existed and that termination of the father's parental rights was in the child's best interests. We vacate one ground for termination relied upon by the trial court due to the application of an incorrect standard in the court's order, but we affirm the court's reliance on the remaining grounds for termination and its best interests determination. The trial court's termination of the father's parental rights is accordingly affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated in Part, Affirmed in Part, and Remanded.**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

David M. Jones, Franklin, Tennessee, for the appellant, D.W.

Herbert H. Slattery, III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### BACKGROUND AND PROCEDURAL HISTORY

This termination of parental rights case began on July 8, 2019, when the Tennessee Department of Children's Services ("the Department") filed a termination of parental rights petition with respect to two children, including the child at issue here, K.W. ("the Child").

_____

[1] In termination cases, it is the policy of this Court to redact certain names in order to sufficiently protect the identities of the children involved.

On December 27, 2019, the Williamson County Juvenile Court ("the trial court") entered an order terminating the parental rights of all the Respondents named in the petition, including those of D.W. ("Father"), the Appellant in the present appeal. In a prior appeal of this case, we vacated the trial court's termination of Father's parental rights upon concluding that the court "erred in allowing [his] attorney to withdraw from representation on the first day of trial." *In re Tavarius M.*, No. M2020-00071-COA-R3-PT, 2020 WL 7479411, at *1 (Tenn. Ct. App. Dec. 18, 2020). The case against Father was tried again upon remand from this Court.

Exhibits introduced at the retrial reveal that the Department's involvement in this matter can be traced back to early 2017. The exhibits further show that, after the Child was removed into the custody of the Department, the trial court entered an order finding the Child "dependent and neglected as to Father" based on Father's substance abuse, domestic violence history, and mental health concerns, among other issues. A number of permanency plans were created for Father throughout the pendency of the period following the Child's removal, and at the retrial, much of the testimony focused on Father's failure to take steps to address his drug issues and to maintain a relationship with the Child post-July 2018. Significant proof was also offered as to the Child's remarkable improvement within his current foster home.

The first witness to testify was the Child's current foster mom, K.M. ("Foster Mother"). Foster Mother testified that the Child had lived with her since February of 2018 and that her husband and three other children also lived in the home. Foster Mother, who was a teacher, was initially introduced to the Child in September of 2017 when he came as a student to her kindergarten class. In describing the origins of her decision to become a foster parent for the Child, Foster Mother testified as follows:

> While he was in my classroom, he was . . . exhibiting some severe behavioral issues, and the foster family he was with[2] said that they could no longer handle [the Child]. And I found out that [the Child] was going to have to leave and go somewhere else. So I came home that night and just asked my husband -- you know, I said, I developed a bond with this child; is this something that our family might consider doing, and my husband and I prayed about it and thought about it for a week or so and just felt like God was leading us to become foster parents for [the Child].

In elaborating on the behavioral issues she had observed, Foster Mother testified that the Child "was hitting other children," "used a lot of profanity," and "just [made] a lot of disruptions in the classroom." According to her, if the Child did not get his way, "he would urinate on himself" and "try to run around the classroom and do different things." The

---

[2] Later in her testimony, Foster Mother stated that the Child had been in two foster homes prior to the placement with her family.

Child's urination issue was something that had occurred "frequently."

Beyond these behavioral problems, Foster Mother's testimony indicated that the Child had been struggling academically when she met him. The Child was repeating his kindergarten year, she noted, and could not even write his name. She further testified that he "didn't know any of his letters" and "wasn't counting beyond maybe ten."

Despite these concerns, Foster Mother's testimony indicated that the Child had progressed greatly since coming into her care. Testifying to this at trial, she stated in part as follows:

> [The Child] is a completely different child. He has absolutely no [behavior problems] anymore. The most behavior I would say that [the Child] has that I have to get on to him is he has his own bedroom, and, you know, little things, Oh, did you pick up your shoes off the floor . . . minor things like that.
>
> . . . .
>
> I cannot believe that he is the same child that walked into my classroom that day. When he came, [the Child] was actually in the special ed program at school. He had an IEP, so he was in special ed. This year, in third grade, we were able to have him tested again, and [the Child] completely tested out of special education. At our school we have three tiers. Tier 1 is your basic level education where all kids -- it meets the needs of all children. Tier 2 is where they're not in special education, but they need some extra help. And Tier 3 would be considered special education.
>
> Well, [the Child] went from Tier 3 all the way to Tier 1. He does not need any type of Title programs on interventions. [The Child's] grades . . . are [all] a 90 or above.

Foster Mother testified that the Child was reading "right where he needs to be" and that he is "such a happy child."

In testifying as to her efforts to provide the Child with a stable environment, Foster Mother stated that the Child had initially thrown tantrums upon coming to her home but that her family had continued to let the Child know they cared about him and wanted him in their home. Things started to turn around, she noted, after a family vacation that occurred in the first summer the Child was with them. Foster Mother reported that the Child's "entire demeanor had changed" following the family's trip to the beach and that he stopped having tantrums and other behavior issues. She expressed concern for the Child if he were to be removed from the structure of her home.

According to Foster Mother, sexualized behaviors from the Child had been noted in his previous foster home, and the Child was put into a program for such behaviors after coming to Foster Mother's home. Foster Mother stated that she had not noted any sexualized behaviors from the Child while in her care.

Although the Child had originally participated in certain therapy twice per month, the need for that had dissipated. Foster Mother testified that "it got to the point that [the Child] didn't have any issues, so his therapist taught him how to play checkers and different stuff like that." As for family and extracurricular activities that the Child participated in, Foster Mother stated, among other things, that the family usually goes on two to three vacations a year and that the Child is involved in baseball and basketball. She further testified that the family goes to church on Wednesday nights and on Sundays, and she indicated that the Child loves to watch sports with her husband and her other sons.

Foster Mother testified that the Child calls her and her husband "Mom" and "Dad," respectively, and that he was bonded to the children in her home and her extended family. She testified that there was an "incredible bond" and noted that the Child had a great relationship with all the grandparents. The grandparents, she noted, treat the Child just as he is their grandson.

Foster Mother stated that the Child saw Father last in July 2018, and when asked if she and her family were willing to adopt the Child if he became available for adoption, she replied, "100 percent, yes." When she was questioned about whether the Child asked about Father, Foster Mother testified that the Child would ask about Father "a little bit" in 2018 but "in the past year and a half to two years, [the Child] does not mention his father at all."

Regarding certain "memories" the Child had recalled of Father during 2018, Foster Mother noted that some of these memories had been positive in nature. Other memories, however, were described by Foster Mother as "not so pleasant." Among other things, Foster Mother stated that the Child had "expressed . . . that his father taught him how to hide drugs in his [rectum]." She testified that the Child had acted that out and showed how Father had taught him.

Foster Mother testified that she facilitates visits with the Child's biological half-sibling, including birthday parties and going to movies. She testified that she intended for that contact to continue if the Child remained in her home and stated that she will always make it available "[a]s long as [the Child] wants to see his brother."

Next to testify was Amanda Smith ("Ms. Smith"). Ms. Smith, who at the time of trial was a Department team leader for social services in Wilson County, testified that she was previously a case manager for the Department and for the Child's case from June 2019 to the end of August 2019. Ms. Smith testified that she had not had any concerns about the Child's foster home placement and noted that the Child was "very bonded" to his foster

family and seemed to be doing "very well." She also testified that Father never visited the Child while she had the case.

According to Ms. Smith, despite her efforts to contact Father, she did not have any contact with him while she served as case manager. She described in detail her efforts to reach Father by phone, by text, and even by certified letters. In total, she had attempted to make twelve different contacts during her tenure, but Father never responded. As evidenced by other testimony discussed *infra*, communications between Father and the Department were a source of much concern throughout this custodial period.

Rachel Kinard ("Ms. Kinard"), an in-home care coordinator with Camelot Care Centers, was next to testify. Ms. Kinard testified that she had worked with the Child from January 2018 up until about two weeks prior to trial. Her testimony supported the account Foster Mother shared regarding the significant improvement in the Child's behavior. In relevant part, she testified as follows:

> So before he went to [his current foster family], [the Child] had a lot of behavioral problems. He would become really aggressive and angry. He would have temper tantrums, outbursts that would last anywhere from two to four hours, and they would be from anywhere for him being told no to where he would just get angry about different things, if someone touched his stuff, or he couldn't get the snacks that [h]e wanted right then and there.

Continuing on, she stated:

> He was also -- we considered him sexually reactive at the time. He would masturbate right in the living room in front of the foster children and the foster parent, the home that he was in. He would hump different things. So he was referred to a service called Scarab's at the time.

According to Ms. Kinard, there was big improvement during the summer of 2018. She stated that the current foster family "provided the structure [the Child] needed" and that the Child receives "the unconditional love that he craved." She further testified that the Child was now "almost a completely different child because of how happy that he can be and how loved he feels" and stated that she has "never" worked with a child that has had such a dramatic improvement as this Child.

Ms. Kinard's testimony also touched on troubling concerns about Father's involvement in the Child's life. She testified that the Child had stated that Father tried to kill someone in front of him. Additionally, she testified that the Child had previously talked a lot about guns and stated that he and Father "would go deer hunting but it was not for animals." Further, Ms. Kinard noted that the Child had talked about Father smoking marijuana.

According to her testimony, during a contact she made with Father, Father expressed an unwillingness to take action:

[H]is main concern was that he was really upset that [the Child] was in foster care at all, and that he was not going to do anything because he did not think that it was fair for him to have to complete any steps since it was not his fault that [the Child] was in foster care.

Before a May 2018 visit that occurred between the Child and Father, the Child was reportedly "really nervous" and "cried throughout the day." Ms. Kinard did note, however, that there were no concerns during the visit. The next visit between the Child and Father, she stated, occurred in July of that year, and Father had reportedly not expressed an interest in visiting in the interim. She testified that the Child had fun at the July 2018 visit, which occurred at Chuck E. Cheese, but that there had not been a visit between the Child and Father since that time.

Ms. Kinard had observed Father get angry during Child and Family Team Meetings and during court, and she testified that Father appeared to be unable to control his emotions. She agreed that Father was volatile and "would get very angry very fast." When later elaborating upon her observations, she stated as follows:

During the Child and Family Team Meetings, [Father] would get upset about the services that he was required to take, and he would walk out of the meetings or he would just hang up. And then the Department could not get ahold of him for several months after that, and he would not request visits. So the consistency on that part is an issue, I feel like.

And during court -- there were times when he would be present at court and then other times he wouldn't be present at court. And during those times, he would, again, argue about the services he was having to be ordered to take.

Ms. Kinard testified that the Department had been offering to pay for Father's treatment, but she noted that "during that time, [Father] . . . admitted in court that he would turn his phone on airplane mode and ignore any phone calls or text messages he had and would mass delete any that he had." This made it "almost impossible," she explained, for the Department to get ahold of him. She reported that Father had admitted to being in receipt of text messages, phone calls, and voice mails, but that he did not check them.

According to Ms. Kinard, the need to participate in drug screens was often discussed with Father during meetings, and the Department offered to come to Father to administer screens, while also offering him transportation. Father reportedly refused this, however. Ms. Kinard noted that Father had been very open about his drug usage in court and that he did not have an intention to stop using.

Ms. Kinard stated that one of Father's recommendations from his alcohol and drug assessment had been to do intensive inpatient treatment, but due to concerns Father had about his job, the judge had allowed Father to do intensive outpatient services instead. He never completed that, however, according to Ms. Kinard's testimony.

When asked what concerns she would have if the Child were to be moved from his current foster home, Ms. Kinard testified as follows:

> It would be very traumatic for him because of how long he's been placed with them and how attached he is to them. He is very attached to them. He wants to be adopted. He does not want to move, and he considers them his family.

She testified that the Child has "processed this in therapy . . . and . . . is ready."

Following Ms. Kinard's testimony, the trial court heard from Karmen Davis ("Ms. Davis"), an investigation coordinator with the Department. Previously, Ms. Davis had been a Department team coordinator for several counties, and she noted that she had been a team coordinator for most of the Child's time in foster care. Ms. Davis testified that the Child had been removed into foster care in April 2017 and stated that the Child had eventually been adjudicated dependent and neglected. According to her testimony, Father did not visit at all during the four-month period preceding the filing of the termination petition. Moreover, Ms. Davis testified that she was not aware of *any* contact between Father and the Child during that period. She stated that the Department had reached out to Father several times. Whereas a pause in visitation had previously been initiated out of a concern for the safety of the Child,[3] Ms. Davis stated that Father had been informed of what he needed to do to resume visits again after they were paused.

As for therapeutic visits Father had with the Child in the beginning of the case, Ms. Davis testified that Father had been "hostile" and said "inappropriate" things during visits. He also frequently cut his visits short. When the Department would talk to Father about the inappropriate things that were said, Father would become upset and leave. Of course, as noted above, he eventually stopped making efforts to visit altogether.

Ms. Davis testified that permanency plans were created after the Child came into

---

[3] Ms. Kinard had previously provided testimony about this matter as well, noting that the Child's therapist had made a recommendation on a pause in visits. Ms. Kinard noted that, around this time, "[the Child] showed a lot of anger towards his dad and reported that he would beat up his dad if he saw him because he did not think he was a good person."

the Department's custody, and her testimony revealed that drugs screens were an ongoing issue. Ms. Davis stated that Father had admitted to having a history of drug and alcohol abuse issues at the initial Child and Family Team Meeting, and she claimed Father came to that meeting smelling of marijuana. Although the Department asked for a drug screen, Father responded that he would not submit to one. Ms. Davis could not recall a single occasion where Father was able to present a clean, *random* drug screen. She only could recall a single incident where Father ever presented with a drug screen he passed, one for which he "knew he was going to be drug screened" beforehand. She generally described incidents where Father "wouldn't follow through" on showing up for drug screens and also noted that, at other times, Father would respond to requests for drug screens by saying that he was "not able to come in" and that he would come in when he was "clean." Efforts were made to be accommodating to Father, and Ms. Davis noted that Department officials had made efforts to stay late to work around Father's schedule and conduct drug screens in locations closer to Father. According to Ms. Davis, Father had admitted on occasions that he would test dirty if he were drug screened.

Ms. Davis also testified to the difficulties that accompanied attempted communications with Father. When testifying to the efforts made by the initial case manager, Ms. Davis stated as follows:

> [She] would try to call him; she would send him text messages; she would go through his attorney to reach out to him. We even had contact information for [Father's] mom and sister, and we tried to contact them to have them to get in contact with [Father].

She reported that Father had answered in the past "because he didn't know the number" but that "once he got familiar with the number, he would not answer." When recounting her own experiences trying to contact Father, Ms. Davis testified as follows:

> I was able to get ahold of him when I called him from a new number. And then I asked him to come in for a drug screen. He said that he was in Columbia, Tennessee. I told him that I could set up for him to even do the drug screen in Columbia, Tennessee, so that way it wasn't far from where he was at work at. I told him I would give him a call -- he asked me could I give him a call back in about an hour. I gave him a call back, and he did not answer. I called him like every 30 minutes from -- it was like 12 o'clock all the way until 6:00 p.m., and [Father] did not answer.

Ms. Davis testified that Father was "often" aggressive towards Department staff, even prompting the Department to call law enforcement up to its office in connection with one Child and Family Team Meeting. She further stated that Father "used profanity all the time." She testified to one occasion where Father had allegedly used "racial slurs that were about the previous caseworker."

- 8 -

Ms. Davis initially testified that Father did not complete any of the tasks on the first permanency plan but then stated that he had completed the alcohol and drug assessment. He had reportedly not, however, completed any of the recommendations of that assessment. Further, Ms. Davis testified that Father had not completed any of the other various assessments called for in the permanency plan. Although a case manager had attempted to help Father get into rehab, Father would not sign the necessary releases to facilitate that. Regarding Father's failure to complete intensive outpatient treatment, Ms. Davis testified that Father had expressed the sentiment that his drug use did not impact his parenting. She further testified that Father "felt like he did nothing wrong."

When asked if Father had demonstrated a willingness or ability to assume custody of the Child, Ms. Davis responded that Father had not. In relevant part, she stated that the Department did not know if he had stable housing or income and noted that Father had not been in consistent communication and had not been consistently visiting. Ms. Davis further noted that the Child had significant behaviors when he first came into foster care, ranging from the use of racial slurs, being physically aggressive to staff and foster parents, using profanity to staff, and urinating in the cars of Department staff. Given the improvement the Child had made, Ms. Davis testified that she was concerned the Child would regress if he was removed from the stability that he experienced at the time of trial. She testified that the Child was bonded to his foster parents and that there was not a meaningful relationship between Father and the Child at the time she left the case.

Next to testify was Sara Fischer ("Ms. Fischer"), a Department team leader who, at the time of trial, was supervisor over the Child's case manager. Ms. Fischer testified that the Child was thriving in his foster home and was a "remarkable" child. Whereas the Child had previously called her and another coworker a "white bitch," she testified that he now presented as "very respectful" and a "very loving child" who is "just happy all the time."

Ms. Fischer testified that the Child has questions about his future and how long he will have to be in foster care. She further noted that the Child is "very bonded" with his foster parents and the other children in their home. She expressed concern that, if the Child were removed from his current stability, it "would be ripping everything out from underneath [him] . . . and disrupting all of the progress that he has made thus far." According to her, the Child wants to be adopted. Ms. Fischer also testified that Father had pending charges at the time of trial for a probation violation.[4]

For his part, Father testified that he had been "doing a lot of meditation" to better himself. He stated that he worked full time as a cashier and lived in a house owned by a

---

[4] Father later admitted in his testimony that he had previously pleaded guilty to theft and evading arrest in October 2019.

family member. He testified that he loved his son and submitted that placing the Child back with him was "the right thing to do." Although he testified that he had paid child support in the past, he indicated on cross-examination that he owed thousands of dollars in child support.

The trial court took the case under advisement upon the close of proof by the parties, and on April 16, 2021, the trial court entered an order terminating Father's parental rights. The trial court determined that three grounds for termination were applicable: abandonment by failure to visit, substantial noncompliance with permanency plan, and failure to manifest an ability and willingness to assume custody. The court further determined that the termination of Father's parental rights was in the Child's best interests. This timely appeal followed.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. They must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our

customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

Although Father nominally challenges the three grounds for termination relied upon by the trial court, as well as the trial court's best interests determination, his brief offers no substantive argument as to how the trial court erred. Although ordinarily this would constitute a briefing deficiency and subject Father's raised issues to a finding of waiver, termination of parental rights cases present this Court with a special duty. In order to help "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures," we are required to review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."). Father's brief calls our attention to this mandate and simply asks that we "review the record to determine if such supports the conclusion of termination of the Father's parental rights." Although we will of course fulfill the mandate set forth by the Tennessee Supreme Court in *Carrington*, the reliance by Father's counsel on *our duty* to perform this review—and his concomitant failure to offer any actual substantive argument on Father's behalf—is deserving of comment. In a previous decision, we cautioned against attorneys proceeding in such a manner:

> Mother's counsel offers little argument in support of Mother's request for reversal of the statutory grounds supporting the termination. Instead, counsel cites our Supreme Court's holding in *Carrington*[.] . . . We agree that our review of each ground and the best interest decision is required; however, we caution counsel against the use of our Supreme Court's holding in this manner. *See generally* Tenn. Sup. Ct. R. 8, RPC 8(3) (providing that lawyers are obligated to act as a zealous advocate on behalf of his or her client).

*In re Yariel S.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *5–6 (Tenn. Ct. App. Jan. 6, 2017).

Likewise, here, we caution counsel against the use of the *Carrington* mandate as it has been utilized in the present briefing. Mere invocation of the *Carrington* holding serves a client very little, as this Court is fully aware of that case. In our view, meaningful

advocacy on behalf of a client requires much more than occurred here.

Nevertheless, in turning to the review that is required under *Carrington*, we will first examine the three grounds for termination found by the trial court. As discussed herein, because we are able to affirm two of the three grounds that were relied upon by the trial court, we will then shift our discussion to an examination of the trial court's best interests determination.

*Abandonment by Failure to Visit*

At the time the underlying petition in this case was filed, the statutory text applicable to this ground for termination provided that "abandonment" can be established, among other ways, when:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102. The statute further provides that it shall be a defense to this ground that the failure to visit or support was not willful. *Id.* The absence of willfulness is an affirmative defense. *Id.*

There is clear and convincing evidence to support this ground for termination. A review of the record shows that Father did not visit with the Child in the four months immediately preceding the filing of the termination petition. Moreover, as previously noted, Ms. Davis testified that she was not aware of *any* contact between Father and the Child during the relevant statutory period. The record contains ample testimony indicating that Father was in control of his ability to visit and maintain a relationship with the Child but that he simply did not exercise that control to foster his parent-child relationship. Indeed, the record shows that Father often disengaged himself from the larger custodial episode. Ms. Davis testified that Department staff had reached out to Father in an attempt to get him to visit, but as already noted herein, Father took efforts to ignore communications from the Department. Based on the foregoing, the court's ultimate finding that his failure to visit was willful is therefore also appropriately supported. *In re Audrey S.*, 182 S.W.3d at 864 ("Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so.").

*Substantial Noncompliance with the Permanency Plan Requirements*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2).  In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014).  "The trial court must then find that the noncompliance is substantial." *Id.*  Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548.  "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49.  Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

Pursuant to Tennessee Code Annotated section 36-1-113(k), the trial court's order must contain "specific findings of fact and conclusions of law." *See* Tenn. Code Ann. § 36-1-113(k).  The requirement for specific findings in termination orders is a highly significant one and "reflects the Tennessee General Assembly's recognition of the necessity of individualized decisions in these cases." *In re C.R.B.*, No. M2003-00345-COA-R3-JV, 2003 WL 22680911, at *3 (Tenn. Ct. App. Nov. 13, 2003).  Moreover, it "reflects the legislature's understanding that findings of fact and conclusions of law facilitate appellate review and promote the just and speedy resolution of appeals." *Id.* "Meticulous compliance" with the mandates of Tennessee Code Annotated section 36-1-113(k) is required, *In re Maria B.S.*, No. E2011-01784-COA-R3-PT, 2012 WL 1431244, at *3 (Tenn. Ct. App. Apr. 25, 2012),  and "[w]hen a trial court fails to enter an order containing adequate findings of fact and conclusions of law with regard to all alleged grounds for termination, the Tennessee Supreme Court has instructed the appellate courts to remand the case to the trial court for the preparation of appropriate written findings of fact and conclusions of law." *In re C.R.B.*, 2003 WL 22680911, at *4.  We have previously urged judges and litigants to be thorough in the preparation of orders, particularly when the rights of parents and minor children are involved. *In re Jaylah W.*, 486 S.W.3d 537, 554 n.18 (Tenn. Ct. App. 2015).

Here, the trial court's findings indicate that it technically did not apply the proper standard.  In concluding that this ground was established, the trial court stated in relevant part as follows: "Father *has never been in substantial compliance* with the tasks on the permanency plan that are the priorities in this case: substance abuse and mental health.

Therefore, Father's parental rights should be terminated on this ground." (emphasis added) The relevant issue is not Father's substantial compliance with regard to the permanency plan. Instead, the appropriate standard is whether there has been "substantial noncompliance." *Id.* at 555; *see also In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *14 (Tenn. Ct. App. Dec. 22, 2020) (noting that section 36-1-113(g)(2) does not require that a parent "substantially comply" with a permanency plan). Inasmuch as the trial court's reliance on this ground is a product of its written application of a standard not in accordance with the statute, we are compelled to vacate this ground for termination.[5] *See In re Jayden L.*, No. E2020-01668-COA-R3-PT, 2021 WL 2255496, at *3 (Tenn. Ct. App. June 3, 2021) ("Given the concern that arises from these written findings as to whether the trial court actually applied the proper standard in its ultimate disposition, we are compelled to vacate the trial court's order with respect to this ground."). There is certainly a significant breadth of evidence in this case pointing to Father's disinterest in taking steps to work his permanency plan, but as a point of instruction, we remind the trial court again that "[m]eticulous compliance" with the mandates of Tennessee Code Annotated section 36-1-113(k) is required. *See In re Maria B.S.*, 2012 WL 1431244, at *3. The order under review nominally applies the incorrect standard, and as a result, the finding on this ground must be vacated.

*Failure to Manifest an Ability and Willingness to Personally Assume Custody or Financial Responsibility of the Child*

The last ground for termination relied upon by the trial court is codified at Tennessee Code Annotated section 36-1-113(g)(14). That statute provides that a parent's rights may be terminated when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination, which is a relatively new addition to the Tennessee Code, requires the Department to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The Department must first "prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, the Department "must . . . prove that placing the children

---

[5] We do not remand the matter for further findings pursuant to the proper standard, however, in light of the rest of our disposition herein, which results in an affirmance of the termination of Father's parental rights.

- 14 -

in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

As to the first of the aforementioned prongs, the Tennessee Supreme Court has recently clarified that the statute "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Accordingly, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.*

In its order finding this ground applicable, the trial court noted the concerns that surrounded Father, including his substance abuse issues, and observed that the Child had manifested "serious disruptive behavior" when he entered custody. Nevertheless, the court noted that Father had never addressed his mental health or substance abuse despite the Department's efforts. Further, the court observed that Father had denied needing help. Continuing on with its analysis, the trial court stated in relevant part as follows:

> Even though Father testified at trial he would pass a drug screen, there still remains no consistent period of sobriety the Court can identify. Father never received any treatment and rarely submitted to random drug screens. When he did, he was either positive or admitted he was positive. As Ms. Davis testified, he was always very honest about his drug use. He did not think it affected his parenting. Father also has had multiple petitions for contempt for non-payment of child support during this case.
>
> . . . .
>
> It is for the above reasons, the Court can find Father has not demonstrated an ability and willingness to assume custody or financial responsibility of the child.
>
> The Court also finds placing the child in Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the child. From the beginning, there were concerns about Father's parenting (due to his mental health and substance abuse). This was apparent at the supervised visits. Ms. Davis testified Father would make inappropriate comments in front of the child, calling the staff . . . "white bitch." The child would then mimic Father's behavior and racial slurs. Father was arrested during one visit. He was aggressive and there were safety concerns.
>
> The [court] credits greatly the testimony of Ms. Kinard, the in-home

- 15 -

care coordinator for the child for almost the entire time he has been in custody. She described his behavior in the beginning as being aggressive, angry, having long temper tantrums and being sexually reactive.

Almost immediately after being in the . . . foster home, the child's behavior improved. . . . . She said if the child were removed now, it would be very traumatic for him since it has been so long and he is so attached. It would be detrimental to his wellbeing. He has a real fear of being removed from the [foster family].

Father has not had a clinical and parenting assessment. He made no improvement in his parenting during his few supervised visits with the child. He has not had any formal parenting instruction. His mental health and substance abuse remain untreated.

Removing the child from his current stable, healthy, and loving family would be terribly traumatic, psychologically damaging, and cause substantial harm to the child. Every witness testified how important this family is to the child. Even Father acknowledged the child was thriving and said he would not "cut contact with foster parents."

The Court finds the Department has proven this ground by clear and convincing evidence.

The evidence presented at trial clearly supports the trial court's findings, and having reviewed the record transmitted to us on appeal, we therefore agree with the trial court's conclusion that this ground for termination was sufficiently supported.

*Best Interests*

When at least one ground for termination has been properly established against a parent, as it has in the present case, we turn our focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572.

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis

"must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). In Tennessee, the General Assembly has codified a list of nine non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings.[6] These factors are as follows:

> (1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2)  Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6)  Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7)  Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8)  Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9)  Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular

---

[6] Although not pertinent to this appeal, we observe that the best interest inquiry was recently modified by statute shortly after the entry of the final judgment in this case. *See* 2021 Tenn. Pub. Acts., ch. 190, § 1; *In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *5 n.5 (Tenn. Ct. App. July 14, 2021) (noting that the General Assembly listed additional factors to be considered under an amended version of the best interest statute).

child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878.

Upon our review of the record, we are of the opinion that there is clear and convincing evidence to support the conclusion that termination of Father's rights is in the Child's best interests. As the trial court noted when engaging with the statutory best interest factors, "Father denied he needed any help at all or needed to change his lifestyle" for the majority of the case notwithstanding his positive drug screens and "explosive behavior." Although the trial court observed that Father had appeared to make some improvements in his stability by the time of trial, it was unable to assure the Child's safety based on the "lack of participation by Father with the Department to address the reason the child came into care." The court observed that the Department had provided numerous services for Father but that there had "not been a sustained adjustment in Father's conduct." As for Father's contact with the Child, the trial court noted that it was undisputed that Father has not seen the Child since July 2018 and that the few visits that occurred prior to that were "troublesome." The trial court noted that Father did not communicate with the Department regularly and never asked for continued visits. The trial court further noted that the Child had last asked about Father in 2018 and that there was "not a meaningful relationship between the child and Father."

The trial court also highlighted the positive influence of the Child's foster family, acknowledging that there was "testimony from every witness for the Department about the strong bond the child has with his foster family." As for concerns that existed with Father, the trial court referenced the testimony about how Father had taught the Child to hide drugs, while also placing emphasis on Father's failure to regularly submit to and pass drug screens. Moreover, the trial court mentioned the concerns that existed as to Father's mental health and the evidence of his prior inability to regulate his emotions.

As alluded to previously, we discern no error in the trial court's weighing of these considerations and its ultimate best interests conclusion. As the above findings by the trial court demonstrate, the termination of Father's parental rights is clearly in the Child's bests interests.

## CONCLUSION

For the reasons stated herein, namely the inclusion of findings under the incorrect statutory standard, we vacate the trial court's finding pertaining to the substantial noncompliance with permanency plan ground for termination. The trial court's order terminating Father's parental rights is otherwise affirmed.

s/ Arnold B. Goldin
ARNOLD B. GOLDIN, JUDGE